Filed 2/4/16  In re C.E. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re C.E., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>C.E.,<br><br>        Defendant and Appellant. | A145024<br><br>(Solano County<br>Super. Ct. No. J40199) |

C.E. (Minor) appeals a dispositional order committing him to the California Department of Corrections and Rehabilitation, Division of Juvenile Justice (DJJ).[1]  He contends the juvenile court abused its discretion in committing him to DJJ rather than to a less restrictive placement and that it improperly imposed conditions of probation.  We shall strike the challenged probation conditions and otherwise affirm the order.

---

[1] In 2005, the powers of the Department of the Youth Authority (or Youth Authority, or CYA) were transferred to the Department of Corrections and Rehabilitation, Division of Juvenile Facilities (DJF).  (Gov. Code, § 12838.5; Welf. & Inst. Code, § 1710.)  DJF is part of DJJ.  (*In re D.J.* (2010) 185 Cal.App.4th 278, 280, fn. 1.)  The parties to this appeal refer to the authority to which Minor was committed as DJJ, and we shall do likewise.

1

# I. BACKGROUND

## A. First Wardship Petition; First Probation Violation

Minor has been the subject of four wardship petitions and has suffered eight violations of probation. (Welf. & Inst. Code,[2] § 602.) The first petition, filed on June 9, 2010, when Minor was 13 years old, alleged he had committed battery with serious bodily injury (Pen. Code, § 243, subd. (d)), assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)), and loitering about a school or other place attended by children (Pen. Code, § 653b). The victim of the assault had told police Minor had thrown a rock at her at a park. The victim's father told police the victim had been hit in the eye and suffered nerve damage. Minor had also been found loitering around a middle school after being told not to do so. Minor admitted committing battery with serious bodily injury. On October 15, 2010, the juvenile court adjudged Minor a ward of the court and put him on probation in the custody of his mother. Among his terms of probation, he was ordered to attend anger management counseling.

On March 15, 2011, the Solano County Probation Department (the Probation Department) filed a notice of violation of probation, alleging Minor had violated probation by failing to maintain satisfactory behavior and attendance at school, failing to enroll in and attend mandatory anger management counseling, and failing to obey his curfew on two occasions. Minor admitted failing to attend anger management counseling and the remaining charges were dismissed. Minor was continued on probation and ordered to spend four weekends in juvenile hall.

## B. Second Wardship Petition; Second and Third Probation Violations

The Solano County District Attorney filed a second wardship petition on April 28, 2011, alleging Minor had resisted, obstructed, and delayed a peace officer. (Pen. Code, § 148, subd. (a)(1).) According to the Probation Department, Minor was found with a group of known members of the Sureño gang at 9:20 p.m. on April 26, 2011. Police officers told Minor to stop, but he fled from them. When arrested, he told the police he

---

[2] All undesignated statutory references are to the Welfare and Institutions Code.

knew he was in a gang area with gang members. He admitted the charge, was continued as a ward in his mother's custody under the supervision of the Probation Department, and was ordered to spend six weekends in juvenile hall.

The second notice of probation violation was filed on October 18, 2011, alleging Minor had failed to maintain acceptable behavior in school and failed to obey his parent at home. The Probation Department's intake assessment indicated that on September 22, 2011, Minor was suspended from school for swearing at a teacher; on September 29, he was suspended for instigating a fight; on October 5, he was suspended for having a baby bottle full of Nyquil; and on October 14, he was suspended for insulting and using profanity toward school staff. Minor's mother reported Minor was out of her control. Minor admitted he had failed to behave acceptably at school. He was placed in his mother's custody under the supervision of probation and ordered to spend five weekends in juvenile hall.

A third notice of probation violation was filed on December 16, 2011, alleging Minor had failed to participate in the Fairfield Day Reporting Center (DRC) as directed, failed to attend school, used illicit drugs, and failed to complete his probation-ordered weekend academy. According to a Probation Department report, Minor had last participated in the DRC on November 9, 2011, and efforts to contact him and his family had been unsuccessful; he had accrued 24 periods of unexcused absences from school; a urine sample had tested positive for marijuana; and he had failed to participate in two days of the weekend academy. A supplemental report also noted that Minor was receiving failing grades in most of his classes and his mother stated that Minor had begun to challenge her authority. Minor admitted he had failed to attend school and failed to abstain from marijuana. The juvenile court continued Minor in his mother's custody and ordered him to spend five weekends in juvenile hall.

## C. Third Wardship Petition; Fourth Through Eighth Probation Violations

The District Attorney filed a third wardship petition on February 1, 2012, alleging Minor had committed false impersonation (Pen. Code, § 529) and falsely represented himself to a peace officer (Pen. Code, § 148.9). The Probation Department report

3

explained that Minor had been seen loitering in an area known to be frequented by Sureño gang members. He identified himself by his brother's name and signed a citation by that name. Minor admitted falsely representing himself to a peace officer and the remaining count was dismissed. Minor was continued a ward of the court and placed in his mother's custody on probation. The court ordered Minor to serve 60 days in juvenile hall or electronic monitoring and spend five weekends in juvenile hall. On March 2, 2012, Minor was released on an electronic monitoring program.

A fourth notice of probation violation was filed on March 20, 2012, alleging Minor had not complied with his electronic monitoring contract and had failed to complete his weekends in juvenile hall. Minor claimed lack of transportation prevented him from attending to complete the court-ordered weekend. The juvenile court again placed Minor on probation in his mother's custody but ordered him to serve 90 days in juvenile hall; however, after 30 days, he would be eligible to be released on an electronic monitoring program. Minor's mother did not obtain the telephone line necessary for home electronic monitoring.

A fifth notice of probation violation was filed on August 22, 2012, alleging Minor had failed to abstain from illegal drugs, failed to participate in the weekend academy as directed, and failed to participate in the DRC as directed. He admitted to using marijuana, and the remaining counts were dismissed. The juvenile court ordered him placed at the New Foundations program for substance abuse treatment.

Minor entered the New Foundations residential program on September 11, 2012 and was released to his mother's care on January 8, 2013. His performance at New Foundations was good.

On January 25, 2013, two and a half weeks after Minor was released from New Foundations, a sixth notice of probation violation was filed, alleging Minor had been found under the influence of alcohol and had admitted to consuming four beers. The Probation Department reported that a police officer had found Minor in front of a residence at 6:33 in the morning on January 25, 2013. He smelled of alcohol, and he told the officer he was not sure why he was there. The officer arrested him. Minor later said

4

he had left his house because his stepfather was yelling at him and Minor was angry; his mother said that the evening before the arrest, Minor told her he was going to his girlfriend's house, and she allowed him to leave. She also said Minor did not always "follow her rules." Minor admitted the probation violation. He was continued on probation, committed to juvenile hall for 30 days with credit for 18 days served, ordered to serve four additional weekends in juvenile hall, ordered to attend counseling, and referred to family preservation services.

A report prepared for a February 11, 2014 annual review noted that Minor's compliance under the probation officer's supervision over the previous year had been satisfactory. He had participated in two months of therapy and his drug tests had been negative. His grades were satisfactory but he "continually engage[d] in disruptive and defiant behaviors." As a result, he had been suspended and placed in independent studies.

A seventh notice of probation violation was filed on March 27, 2014, alleging Minor had violated his probation's gang terms. The Probation Department's report explained that Minor's behavior had deteriorated in the preceding two months. In February 2014, he was found with known Sureño gang members. He had not been participating in the independent study program, but during a meeting with the probation officer he agreed to do so. Minor admitted having been with other Sureños, but said he was not active in the gang and had not been associating with them regularly. Minor said that he had been present when a close friend was shot and killed and that he had been struggling with depression. After the killing, Minor started drinking and often just stayed in bed. Minor admitted the probation violation. The juvenile court continued him on probation in the custody of his parents and ordered him to participate in counseling and spend five weekends in juvenile hall.

An eighth notice of probation violation was filed on May 2, 2014, alleging Minor had failed to obey all laws and had failed to attend school regularly. Minor had expressed the wish to attend school rather than independent studies, and school personnel agreed to allow him to return to school on a modified schedule. When a school district

5

representative and police sergeant went to Minor's home at 10:30 on the morning of April 15, 2014 to inform him of the decision, Minor was in bed and refused to come to the door. After being re-enrolled, Minor missed school regularly. Minor told his probation officer he had missed school in order to do construction work. He admitted failing to attend school, and the remaining count was dismissed. The juvenile court continued Minor on probation in his parents' custody, directed him to attend counseling, and ordered him to serve four weekend academies.

The probation officer's annual review report, filed in September 2014, stated that Minor had been attending school regularly and his behavior had improved. Minor expressed a wish to graduate from high school and get off of probation. He was participating in a substance abuse group and individual therapy. His drug tests had been negative, although he had missed one test and admitted to smoking marijuana two weeks previously when he was angry at his stepfather. The report noted that Minor lived in a "meager" apartment with a large family and often felt unwelcome there, and that his mother was often angry at him because his probation status led police officers to search their home regularly. He had tried to commit suicide in July 2014 by taking 19 Xanax pills. He said afterward that he had been "tired of everything" and that he had recently been subpoenaed to testify at a friend's trial and was worried about retribution for being a " 'snitch.' "[3] In a December 1, 2014 memorandum to the juvenile court, the Department reported that Minor's participation at therapy and substance abuse counseling and his attendance at school had been sporadic.

### D. Fourth Wardship Petition

A fourth wardship petition was filed on January 8, 2015, alleging Minor had committed second degree robbery (Pen. Code, § 211) and assault with a deadly weapon, a beer bottle (Pen. Code, § 245, subd. (a)(1)).

At a contested hearing, the victim of the crime testified that on the evening of January 5, 2015, he walked to an apartment close to his own to see a friend. On the way,

---

[3] It appears that Minor may have been a witness to a murder and that he would be called to testify at the defendant's trial.

he saw Minor with "a bunch of friends," about six of them, whom he had often seen around his home. Minor approached and said, " 'Who is this fool?' " then told him, " 'Give me your shit.' " When the victim refused, Minor said, " 'Let's jump this fool.' " Two of the others began to hit him. As the victim tried to escape, members of the group tried to catch him, and in the scuffle some of them smashed beer bottles on his head. The victim saw Minor among those following him. The victim testified that Minor tried to beat him, kicked him, and threw a bottle at him, and that someone else took his wallet. The victim's cell phone was also taken in the attack. The victim suffered cuts and injuries to his head and hands.

Minor testified that the victim had approached him and his friends and demanded a beer, that the victim pushed Minor, that his friends then began a physical altercation with the victim, and that when the victim ran, Minor "ended it" and went back to the apartment where he and his friends were hanging out. Minor denied telling the victim to give him his belongings or telling his friends to hurt him. Minor testified that he did not know the names of any of the friends he was with that evening.

The juvenile court found both counts true. Minor later told a probation officer that he " 'swung' " at the victim when the victim took a beer bottle, but that he did not rob him or hit him with a beer bottle. He said he had been trying to behave well in order to end his probation successfully. Before the incident, he had " 'gotten into it' " with his mother, who kept making statements to the effect that she would be glad when he turned 18 in two or three weeks because then she would be able to " 'kick him out.' " He hung out with his friends, other Sureño gang members, and began drinking because he was upset with his mother. He did not want to name his friends because he did not want to be seen as a " 'snitch.' " He was also anxious and concerned that he had a "target on his head" because he had been forced to testify in his friend's murder trial.

Minor turned 18 soon after committing the offenses. The probation officer's report noted that Minor had been afforded a number of services, including general supervision, intensive supervision with DRC and Family Preservation, mentoring groups, weekends in juvenile hall, the New Foundations program, anger management training,

7

family therapy, and individual therapy. Because he was over 18 years old, he was precluded from certain placements, such as the Challenge Program and a General Placement Order. He was eligible for a commitment at DJJ. At DJJ, he would receive extensive physical, psychological, and educational evaluations. He could work on his high school diploma or GED and take advantage of vocational services. He could also participate in a substance abuse treatment program, gang intervention program, victim empathy groups, mental health treatment programs, and life skills groups. The probation officer recommended placement at DJJ.

### E. Dispositional Hearing

At a contested dispositional hearing, a probation officer testified that Minor had seen two people murdered in 2014 and he had had to testify at a preliminary hearing in one of the cases.

The probation officer testified about possible placements for Minor. Because Minor was already 18 years old, he would not be eligible for the Challenge Program, a nine-month program in Solano County, which was more intensive than New Foundations. The only options available to Minor would be New Foundations, county jail, or DJJ. New Foundations was an intensive substance abuse program that also offered group counseling. If Minor were committed there, he might be able to continue seeing his individual counselor as well, and his family would be able to visit him. A minor could be committed to New Foundations more than once. The probation officer did not recommend New Foundations, however, because the program was only four months in length and Minor had already completed it. She believed DJJ would offer more services for Minor than would New Foundations. The nearest DJJ facility was two hours away.

The probation officer testified that Minor was a known member of the Sureño gang. He had been a member since 2011. Minor had been housed in the juvenile detention facility since January 2015, and as of the March 25, 2015 dispositional hearing had been involved in two gang-related fights there, at least one of which he did not instigate. Norteño and Sureño gang members could be found in DJJ, juvenile hall, county jail, and New Foundations.

8

Minor's counselor testified that Minor had post-traumatic stress disorder as a result of seeing two close friends shot and killed in front of him and that he used street drugs, prescription drugs, alcohol, and marijuana to "numb himself." His substance abuse was triggered by interactions with his peer group and arguments with family members. When Minor was placed in juvenile hall, he had asked to have the counselor continue to treat him there; she would not be able to continue as his counselor if he were committed to DJJ.

The counselor testified that Minor was concerned that he might get into more trouble if he were committed to DJJ because the other minors committed there might be more violent and because he would not be able to see his mother often. He was also concerned that he had been labeled a "snitch" because of his testimony in a murder case. Minor did not think he would be able to "handle his triggers" at DJJ.

Minor's mother testified that she attended counseling sessions with Minor when he was at New Foundations, that she believed the sessions improved their relationship and that more sessions would be beneficial, and that she would not be able to visit Minor regularly if he were sent to DJJ. She also testified that Minor had a strong bond with his brothers and sisters and that she thought his problems would get worse if he was away from his siblings for a long period of time.

The juvenile court noted that Minor was now an adult, that Challenge was not an option, and that he had done "every program" available, including intensive supervision, weekends at juvenile hall, New Foundations, DRC, family counseling, and individual counseling. The court concluded that Minor's most recent crime was violent and that he was a danger to the community. The court found the Minor could benefit from DJJ: Minor had been a witness in an ongoing murder case and might be safer at DJJ than closer to the scene of the crime, and DJJ offered a variety of programs, including psychiatric counseling, substance abuse counseling, training, and education. The court continued Minor as a ward and committed him to DJJ for a maximum term of five years.

## II. DISCUSSION

### A. Commitment to DJJ

Minor contends the juvenile court abused its discretion in placing him at DJJ because there was no evidence less restrictive placements would be ineffective or that he would benefit from a DJJ commitment.

"The appellate court reviews a commitment decision for abuse of discretion, indulging all reasonable inferences to support the juvenile court's decision. [Citations.] Nonetheless, there must be evidence in the record demonstrating both a probable benefit to the minor by a CYA commitment and the inappropriateness or ineffectiveness of less restrictive alternatives. [Citations.] A CYA commitment may be considered, however, without previous resort to less restrictive placements. [Citations.]" (*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396; see *In re Teofilio A.* (1989) 210 Cal.App.3d 571, 576–577; *In re M.S.* (2009) 174 Cal.App.4th 1241, 1250 ["Although the DJJ is normally a placement of last resort, there is no absolute rule that a DJJ commitment cannot be ordered unless less restrictive placements have been attempted"].) In making its finding of probable benefit, "[t]here is no requirement that the court find exactly how a minor will benefit from being committed to DJJ. The court is only required to find if it is probable a minor will benefit from being committed." (*In re Jonathan T.* (2008) 166 Cal.App.4th 474, 486.)

Section 202, subdivision (b), provides that minors who are under the jurisdiction of the juvenile court as a result of delinquent behavior "shall, in conformity with the interests of public safety and protection, receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances. This guidance may include punishment that is consistent with the rehabilitative objectives of this chapter." "Punishment" is defined as "the imposition of sanctions," which may include payment of a fine, community service, conditions of probation or parole, "[c]ommitment of the minor to a local detention or treatment facility, such as a juvenile hall, camp, or ranch," and "[c]ommitment of the minor to the Division of Juvenile Facilities, Department of Corrections and

Rehabilitation." (§ 202, subd. (e).) In reaching a suitable disposition for a minor who has been found to be a person described by section 602, the juvenile court "shall consider, in addition to other relevant and material evidence, (1) the age of the minor, (2) the circumstances and gravity of the offense committed by the minor, and (3) the minor's previous delinquent history." (§ 725.5.)

The court in *In re Carl N.* (2008) 160 Cal.App.4th 423, 432–433, explained the purposes of the governing law as follows: "The statutory declaration of the purposes of the juvenile court law is set forth in section 202. [Citation.] Before the 1984 amendment to section 202, California courts consistently held that ' "[j]uvenile commitment proceedings are designed for the purposes of rehabilitation and treatment, not punishment." ' [Citation.] California courts treated a commitment to CYA as 'the placement of last resort' for juvenile offenders. [Citation.] [¶] However, '[i]n 1984, the Legislature replaced the provisions of section 202 with new language which emphasized different priorities for the juvenile justice system.' [Citation.] Section 202, subdivision (b) . . . now recognizes punishment as a rehabilitative tool. [Citation.] . . . [¶] 'Section 202 also shifted its emphasis from a primarily less restrictive alternative approach oriented towards the benefit of the minor to the express "protection and safety of the public" [citations], where care, treatment, and guidance shall conform to the interests of public safety and protection. [Citation.]' [Citation.] 'Thus, it is clear that the Legislature intended to place greater emphasis on punishment for rehabilitative purposes and on a restrictive commitment as a means of protecting the public safety.' [Citation.] It is also clear . . . that a commitment to CYA 'may be made in the first instance, without previous resort to less restrictive placements.' " (Accord, *In re Michael D.* (1987) 188 Cal.App.3d 1392, 1396.)

We find no abuse of the juvenile court's discretion in placing Minor in DJJ. The placement options were limited because Minor was 18 years old. He had been a ward of the court since he was 13 years old, and the court had attempted his reformation through a number of programs, including probation supervision, mentoring and substance abuse groups, individual and family therapy, intensive supervision in DRC, juvenile hall's

11

weekend program, and placement at a local substance abuse treatment facility, the New Foundations residential program. Thus, the court had attempted a "progressively more restrictive and punitive series of dispositions," as contemplated by the statutory scheme. (*In re M.S.*, *supra*, 174 Cal.App.4th at p. 1250.) Despite these efforts, Minor maintained his gang affiliations and continued to violate his probation and reoffend, leading to a total of four sustained juvenile petitions and eight probation violations. At DJJ, Minor would have access to services directed toward the challenges he faced, including programs for substance abuse, gang intervention, victim empathy, mental health, and life skills, as well as educational and vocational services. The evidence is sufficient to support the juvenile court's finding that Minor was likely to benefit from placement at DJJ.

For his argument that the juvenile court abused its discretion, Minor relies heavily on the evidence that his delinquent history had consisted primarily of minor offenses, that he had suffered trauma from seeing a friend shot and killed, and that he had a difficult relationship with his mother. He argues that the probation officer and the court failed to inquire into whether the services he needed to deal with his recent trauma and family dynamics—individual and family counseling, substance abuse program, a gang intervention program, and regular school attendance—were available in any less restrictive setting. However, the record showing that Minor had failed to achieve lasting benefits from placement in less restrictive settings and that a wide range of services were available at DJJ is sufficient to support the juvenile court's finding that Minor was likely to benefit from placement at DJJ. Moreover, as the court noted, Minor's last offense was violent, and the court could reasonably take into account the safety of the public in committing him to DJJ. (*In re Carl N.*, *supra*, 160 Cal.App.4th at pp. 432–433.)

Minor also relies on the evidence that gang members are present at DJJ to argue that it will be difficult for him to escape his gang ties there. Gang members were also present locally, as shown by Minor's long association with the Sureño gang and his gang-related fights while at juvenile hall. Indeed, the probation officer testified that Sureños could be found in each of the possible placements, DJJ, juvenile hall, county jail, and New Foundations. There is no reason to conclude he would be at greater risk at DJJ due

to his gang ties than anywhere else and, as the court noted, Minor would be farther away from his gang associates at DJJ than in a local placement.

Minor also contends the juvenile court abused its discretion in failing to consider additional, unspecified, placements, such as out-of-county or out-of-state placements. He did not suggest any such placements at the dispositional hearing, and he cannot now complain that the court failed to consider evidence not presented to it at the hearing. (See *In re Joseph H.* (2015) 237 Cal.App.4th 517, 544–545.) In any case, as we have explained, the record supports the conclusion that Minor will probably benefit from the DJJ commitment and that less restrictive alternatives would be inappropriate or ineffective. (*In re Angela M.*, *supra*, 111 Cal.App.4th at p. 1396.) The juvenile court did not abuse its discretion in committing Minor to DJJ.

### B. Probation Conditions

At the hearing at which it committed Minor to DJJ, the juvenile court imposed a number of conditions of probation that Minor challenges: obey all laws; obey his parents, custodians, and probation officers; attend school regularly and maintain acceptable grades, behavior, and attendance; notify the probation officer of any anticipated change of address; attend counseling, including drug and alcohol counseling and victim empathy and grief counseling; abstain from alcohol and drugs and submit to testing; not have contact with the victim of his most recent offense; and write a letter of apology within 30 days.[4] (Conditions 1, 4, 11, 15, and 19.)

Minor contends the juvenile court lacked authority to supervise him once he was committed to DJJ. As the Attorney General properly concedes, Minor is correct. "Commitment to DJJ deprives the juvenile court of any authority to directly supervise the juvenile's rehabilitation." (*In re Travis J.* (2013) 222 Cal.App.4th 187, 202; accord, *In re Allen N.* (2000) 84 Cal.App.4th 513, 515 [" '[C]ommitment to the Youth Authority in particular, brings about a drastic change in the status of the ward which . . . removes the ward from the *direct supervision* of the juvenile court' "]; *In re Edward C.* (2014)

---

[4] In its oral pronouncement, the court also ordered Minor to attend anger management counseling.

13

223 Cal.App.4th 813, 829 ["[T]he juvenile court loses the authority to impose conditions of probation once it commits a ward to DJF"].) The challenged probation conditions must be stricken.

## III. DISPOSITION

The probation conditions imposed by the juvenile court in its dispositional order of March 25, 2015 that are set forth in subsection II.B of this opinion are stricken. As so modified, the order is affirmed.

14

_____
RIVERA, J.

We concur:


_____
RUVOLO, P. J.


_____
STREETER, J.


*In re C.E.* A145024

15